UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

Case No. 9:11-cv-80364-RYSKAMP

| | | |
|---|---|---|
| THEODORE CLIMO, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | <u>CLASS ACTION</u> |
| Plaintiff, | ) ) | |
| vs. | ) ) ) | |
| OFFICE DEPOT, INC., et al., | ) ) | |
| Defendants. | ) ) ) | <u>DEMAND FOR JURY TRIAL</u> |

**AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

Case No. 9:11-cv-80364-RYSKAMP

## NATURE OF THE ACTION

1.      Lead Plaintiff Central Laborers' Pension Fund ("Plaintiff"), individually and on behalf of a proposed class (the "Class") of all purchasers of the publicly traded common stock of Office Depot, Inc. ("Office Depot" or the "Company") between July 27, 2010 and March 31, 2011, inclusive (the "Class Period"), by and through its undersigned counsel, brings suit against Office Depot, Steve Odland ("Odland"), Michael D. Newman ("Newman"), and Neil R. Austrian ("Austrian") (Office Depot, Odland, Newman, and Austrian are sometimes collectively referred to as "Defendants").

2.      Plaintiff seeks remedies under the Securities Exchange Act of 1934 (the "Exchange Act") as a result of the fraudulent scheme undertaken by Defendants and the economic loss suffered when the true facts were revealed to the public.  The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

3.      Plaintiff makes the allegations herein concerning the falsity of Defendants' statements and the scienter of the Individual Defendants based upon the investigation undertaken by Plaintiff's counsel, which investigation included analysis of publicly available news articles and reports, public filings, securities analysts' reports and advisories about Office Depot, interviews of former employees of Office Depot, press releases and other public statements issued by the Company, and media reports about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

4.      This case concerns a material tax fraud whereby Defendants issued materially false and misleading statements about Office Depot's earnings, free cash flow, tax receivables, and its

Case No. 9:11-cv-80364-RYSKAMP

overall financial condition.  To accomplish their fraud, Defendants violated General Accepted Accounting Principles ("GAAP") and the rules and regulations of the Securities and Exchange Commission (the "SEC"), thereby causing Office Depot to issue materially false and misleading financial statements during the Class Period.  Defendants' accounting fraud culminated at the end of the Class Period, when the Company announced it would be restating its falsely reported financials.

5.      Prior to the start of the Class Period, it was known throughout the market that Office Depot was losing market share to its competitors.  For example, on March 8, 2010, *Twice* reported that "[t]wo office superstores reported two different fortunes in the fourth quarter, with Staples posting higher net sales and lower net earnings, while Office Depot posted lower sales and a loss." Then, on May 20, 2010, *MarketWatch* reported that "Staples is better positioned to outperform smaller rivals Office Depot Inc. (ODP) and OfficeMax, Inc. (OMX) . . ." and that Staples continued to "take share," "adding the company's 4% sales increase compared against the average 2.5% drop for Office Max and Office Depot."  As a result, Defendants were highly motivated to report positive financial performance for Office Depot during the Class Period and devised a plan to increase cash flow by carrying back its 2010 losses to prior periods.

6.      Defendants' tax accounting manipulations enabled Defendants to successfully create the (false) impression among investors that Office Depot was experiencing increasingly positive financial results, *i.e.*, losing less ground.

7.      At the start of the Class Period, unbeknownst to investors, Defendants authorized Office Depot to make an irrevocable election to carry back tax losses incurred after 2007, but before 2010, pursuant to The Worker, Homeownership, and Business Assistance Act of 2009 (the "WHBAA legislation").  This election enabled the Company to claim a $63 million tax refund with

- 2 -

Case No. 9:11-cv-80364-RYSKAMP

the IRS.  Defendants knew or recklessly disregarded, however, that Office Depot was ineligible for the carry back benefit because of the Company's status as a 52 or 53 week tax filer.  Specifically, the Company's fiscal year ended on the last Saturday in December, which in 2009 was December 26th.  While Office Depot's 2010 fiscal year began on December 27, 2009, for purposes of the WHBAA, it was as if Office Depot's fiscal year actually started on January 1, 2010.

8.    The WHBAA "allows almost all taxpayers with business losses to make an irrevocable election to carry back losses incurred in one year (ending in 2007 and beginning before 2010) for up to five years."  As a result, the carry back, by its explicit terms, could not apply to Office Depot's fiscal year that started – for purposes of the WHBAA – on January 1, 2010.  Defendants knew or recklessly disregarded that the Company had no legitimate basis by which to qualify under the WHBAA legislation for the benefits that it claimed, which resulted in the denial by the IRS of Office Depot's election.  Further, due to the fact that the IRS is under an obligation to review the carry back election within 90 days of the filing, had there been any question as to Office Depot's eligibility under the WHBAA, the Company should have waited to take the tax benefits in question until it received approval from the IRS in March 2011.

9.    Defendants never disclosed there was any doubt that Office Depot was entitled to the tax carry back benefit; rather, throughout the Class Period, Defendants issued a series of the false and misleading statements regarding the Company's recognized tax benefits, including:

- **July 27, 2010**:  "During the second quarter of 2010, we recognized tax benefits of $29 million, which resulted in a tax benefit rate of 75% on the second-quarter loss."

- **October 27, 2010**:  "So in total, we recognized tax benefits of $47 million in the third quarter, reflecting an effective tax benefit rate of 295%."

- **February 22, 2011:**  "Significant tax benefits, from carrying back 2010 tax losses to an earlier tax period, positively impacted earnings in the fourth quarter of 2010."

Case No. 9:11-cv-80364-RYSKAMP

10.     Moreover, for each and every quarter during the Class Period, during the applicable periods of employment, the Individual Defendants personally signed certifications pursuant to §§302 and 906 of the Sarbanes-Oxley At of 2002 ("SOX Certifications"), under penalty of perjury, which falsely attested that each such quarterly "report does not contain *any untrue statement* of a material fact or *omit to state a material fact* necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading. . . ." The Individual Defendants also certified that each such report, "*fairly present[s] in all material respects* the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented. . . ." The SOX Certifications also represented that the Individual Defendants had personally "*[d]esigned* such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed *under our supervision*, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is *made known to us* by others within those entities, particularly during the period in which this report is being prepared."

11.     The Company was later forced to admit that the Individual Defendants' respective SOX Certifications were, in fact, false. On March 31, 2011, after the market closed, Office Depot announced that it would restate its financial results for the fiscal year ended December 25, 2010, and the quarters ended June 26, 2010 and September 25, 2010. Office Depot told the market the restatement would occur on or about April 6, 2011. Office Depot's restatement stemmed from the Company's claims to carry back certain tax losses pursuant to the WHBAA legislation, which the IRS rejected.

12.     Accordingly, the Company's restatement of prior periods' financial results reduced full-year tax benefits *by approximately $80 million* and resulted in the Company recording a *net loss*

Case No. 9:11-cv-80364-RYSKAMP

*of $46 million*, a change from **net earnings of $33 million** for 2010.  It also increased the net loss

attributable to common stock shareholders from $2 million, or $0.01 per share, to **$82 million**, or

**$0.30 per share**.  Additionally, it was revealed that the Company had **wrongly reported $63 million**

**in current tax receivables** associated with the carry back amount, which would now adversely

impact the Company's anticipated 2011 operating cash flow.

13.     In response to the Company's restatements of its financial results, the price of Office

Depot common stock dropped $0.42 per share, or 9%, from a closing price of $4.63 on March 31,

2011, to close at $4.21 per share on April 1, 2011, on heavy trading volume.

14.     On April 2, 2011, the *Palm Beach Post* published an article entitled "Tax Error

Negates Office Depot Profits" discussing the Company's restatement and the resulting **$46 million**

**net loss** as a result of the IRS denial.  Then on April 5, 2011, a *Bloomberg* article entitled "Office

Depot Profit Turns into Loss After IRS Denies Tax Claim," quoted tax and accounting analyst

Robert Willens who stated "[i]t wasn't that hard."  "What could possibly have been so confusing?"

According to the article, during the April 1, 2011 conference call, an analyst at Levin Capital

Strategies called the restatement "very, very disappointing for shareholders," and further suggested

the Company put itself up for sale.

15.     The true facts, which were known by the Defendants, but concealed from the market

during the Class Period, were as follows:

(i)     The $80 million in carry back tax "benefits" Office Depot recognized

during the Class Period for the second, third, and fourth quarter of 2010 were not permitted;

(ii)     The $63 million in current tax receivables associated with the carry

back amount should not have been reported on the Company's balance sheet at December 25, 2010;

Case No. 9:11-cv-80364-RYSKAMP

(iii)     Office Depot's financial results were not reported in compliance with GAAP during the Class Period;

(iv)     Office Depot's financial statements overstated the Company's earnings and understated its losses in violation of GAAP throughout the Class Period;

(v)     The Company's internal controls were inadequate to prevent it from improperly inflating the value of its earnings and assets throughout the Class Period; and

(vi)     Defendants overstated Office Depot's business and financial metrics during the Class Period.

16.     As a result of Defendants' false and misleading statements, Office Depot's stock traded at artificially inflated levels during the Class Period.  When the truth about Office Depot's true financial condition was revealed, Office Depot's stock price fell nearly 31% from its Class Period high of $6.10 on January 5, 2011.  This drop removed the inflation of Office Depot's stock price, causing real economic loss to investors who had purchased the stock during the Class Period.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331.

18.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b).  In addition, the causes of action asserted herein occurred and/or accrued, among other places, in this District.  At all times relevant to this action, Office Depot was headquartered in this District, and many of the acts and transactions alleged herein, occurred in substantial part in this District.

Case No. 9:11-cv-80364-RYSKAMP

19.    In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

20.    Court-appointed Lead Plaintiff Central Laborers' Pension Fund purchased Office Depot securities on the open market during the Class Period, as set forth in its certification previously filed with the Court.

21.    Defendant Office Depot is a Delaware corporation headquartered at 6600 North Military Trail, Boca Raton, Florida.  Office Depot is a global supplier of office products and services.  The Company sells its products and services to consumers and businesses through three business segments: North American Retail Division; North American Business Solutions Division; and International Division.  Sales are processed through multiple channels, consisting of office supply stores, a contract sales force, an outbound telephone account management sales force, internet sites, direct marketing catalogs and call centers, all supported by a network of supply chain facilities and delivery operations.

22.    Defendant Odland served as a director, Chairman of the Board and Chief Executive Officer ("CEO") of the Company until his resignation on November 1, 2010.

23.    Defendant Newman served as Chief Financial Officer ("CFO") of the Company during the Class Period, a role he has held since August 2008.

24.    Defendant Austrian has served as a director of Office Depot since 1998, and assumed the roles of Interim Chairman of the Board of Directors and CEO on November 1, 2010.  Austrian

Case No. 9:11-cv-80364-RYSKAMP

was appointed permanent Chairman and CEO on May 23, 2011. Previously, Austrian served as the Company's Interim Chairman and CEO from October 4, 2004 until March 11, 2005.

25.     Throughout the Class Period, Odland, Newman and Austrian (collectively, the "Individual Defendants"), were responsible for ensuring the accuracy of Office Depot's public filings and other public statements, and they personally attested to and certified the accuracy of Office Depot's financial statements. During the Class Period – specifically on July 27, 2010, October 27, 2010, and February 22, 2011 – the Individual Defendants each signed SOX Certifications included in the Company's public filings stating:

> 1.  I have reviewed this quarterly report on Form [10-Q or 10-K] of Office Depot Inc.;
>
> 2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report.

26.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Office Depot's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases

- 8 -

alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements pleaded herein.

## CLASS ACTION ALLEGATIONS

27.    Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased the common stock of Office Depot during the Class Period.  Excluded from the Class are Defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

28.    Because Office Depot has millions of shares outstanding, and because the Company's shares were actively traded on the New York Stock Exchange (the "NYSE"), members of the Class are so numerous that joinder of all members is impracticable.  According to Office Depot's SEC filings, as of January 22, 2011 (shortly before the close of the Class Period), Office Depot had approximately 277 million shares of common stock outstanding.  While the exact number of Class members can only be determined by appropriate discovery, Plaintiff believes that Class members number at least in the thousands and that they are geographically dispersed.

29.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and all of the Class members sustained damages arising out of Defendants' wrongful conduct complained herein.

30.     Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel experienced and competent in class actions and securities fraud litigation.  Plaintiff has no interests that are contrary to or in conflict with the members of the Class it seeks to represent.

31.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

32.     Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members, in that Defendants have acted on grounds generally applicable to the entire Class.  Among the questions of law and fact common to the Class are:

        (a)     Whether Defendants violated the federal securities laws as alleged herein;

        (b)     Whether Defendants' publicly disseminated press releases and statements during the Class Period omitted and/or misrepresented material facts;

        (c)     Whether Defendants breached any duty to convey material facts or to correct material facts previously disseminated;

Case No. 9:11-cv-80364-RYSKAMP

(d)      Whether Defendants participated in and pursued the fraudulent scheme or course of business complained of;

(e)      Whether Defendants acted willfully, with knowledge or severe recklessness, in omitting and/or misrepresenting material facts;

(f)      Whether the market prices of Office Depot common stock during the Class Period were artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and

(g)      Whether the members of the Class have sustained damages as a result of the decline in value of Office Depot's stock when the truth was revealed and the artificial inflation came out and, if so, what is the appropriate measure of damages.

## DEFENDANTS' FALSE FINANCIAL STATEMENTS FAILED TO COMPLY WITH GAAP AND SEC REGULATIONS

33.      Defendants, as they have now admitted, violated GAAP and SEC rules and regulations, causing the Company to issue materially false and misleading financial statements during the Class Period.

34.      Section 13 of the Exchange Act obligated Defendants to "make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect [the] transactions and dispositions of the assets of the issuer" and "devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that . . . transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and  to maintain accountability for assets."

35.     Now, Defendants have admitted that, contrary to their representations during the Class Period, Office Depot possessed a "a material weakness in the operational controls in the area of accounting for income taxes."

36.     During the Class Period, Defendants falsely and misleadingly asserted that Office Depot's financial statements were presented in conformity with GAAP.  For example, the Company's July 27, 2010 Financial Report stated:

> The consolidated financial statements of Office Depot and its subsidiaries have been prepared in accordance with accounting principles generally accepted in the United States of America.

37.     Pursuant to GAAP, "there are **two primary objectives** related to accounting for income taxes":[1]

(a)     To recognize the amount of taxes payable or refundable for the current year; and

(b)     To recognize deferred tax liabilities and assets for the future tax consequences of events that have been recognized in an entity's financial statements or tax returns.

38.     Defendants have now admitted that Office Depot violated these primary GAAP objectives in accounting for income taxes by materially overstating the amount of the Company's income tax receivables and its net income during the Class Period.

39.     For example, at December 31, 2010, Office Depot's reported receivables were overstated by more than 6.5%, and its net loss attributable to common shareholders was understated

---

[1]     *See, e.g.*, Accounting Standards Codification 740-10-1.

Case No. 9:11-cv-80364-RYSKAMP

by **_more than 97%_** when Office Depot's true loss per share of $0.30 per share was reported to be a loss of $.01 per share.

40.     Office Depot's fiscal years are based on a 52 or 53 week period ending on the last Saturday in December.  Accordingly, the Company's fiscal 2010 year began on December 27, 2009. Since the Company's fiscal 2010 year began prior to January 1, 2010, Defendants caused Office Depot to make an irrevocable election to carry back tax losses incurred after 2007 and before 2010 pursuant to the WHBAA legislation and claim a $63 million tax refund with the IRS.

41.     Indeed, Defendants knew or with severe recklessness ignored that Office Depot was precluded from seeking such claim for a tax refund because it is hornbook law that entities with a 52 or 53 week tax year referencing the last day of a specified calendar month be deemed to end on the last day of the calendar month nearest to the last day of the 52 or 53 week taxable year.

42.     Accordingly, Office Depot's fiscal 2010 year was deemed to begin on January 1, 2010, thereby rendering it ineligible for the benefits afforded by the WHBAA legislation.

43.     Indeed, Defendants knew or with severe recklessness ignored that Office Depot was ineligible to claim a tax refund pursuant to WHBAA legislation because the Company's tax year is deemed to begin on January 1 for purposes of legislative, regulatory or administrative dates, including, but limited to, the due date when its income tax return is required to be filed, the date tax payments are due, or the time for performing other acts or filing other documents with the IRS.

44.     Accordingly, Defendants knew that Office Depot's tax year had historically been deemed to end on December 31, and therefore, knew or with severe recklessness disregarded that the Company had no basis to qualify for the benefits afforded by WHBAA legislation.

Case No. 9:11-cv-80364-RYSKAMP

45.     Confidential Witness #1 ("CW 1") was employed by Office Depot for twenty years until March 2011.  As a District Manager in the Retail organization, CW 1 was responsible for nine stores, including stores located in Ft. Lauderdale, Miramar, and North Miami, Florida.  CW 1's tasks included managing personnel to achieve assigned product and service sales goals.  CW 1 reported to Regional Manager Ken Seher, who reported to Executive Vice President Joe Hills.  Joe Hills reported to President of North American Retail Chuck Rubin ("Rubin"), who was replaced by Kevin Peters ("Peters") in 2010.  Rubin and later Peters reported to Odland and later Austrian.  CW 1 has information regarding Company Directors questioning the tax benefits that Office Depot claimed for 2010.

46.     Indeed, CW 1 recalled Directors in Office Depot's Accounting organization questioning the Company's 2010 claimed tax benefits, which ultimately resulted in the restatement announced at the end of the Class Period.  To that end, CW 1 overheard Directors of Accounting discussing the 2010 tax benefits and making telling comments such as, "we did not learn it this way in school" or "other companies don't do it this way."

47.     Confidential Witness #2 ("CW 2") worked at Office Depot for approximately two years (until mid-calendar year 2010) as a Director of Tax Technology and Business Process Improvement.  CW 2 was responsible for implementing the sales tax modules that were part of the Oracle Financials implementation utilized by Office Depot for its general ledger.  CW 2 was also responsible for designing and implementing information technology controls pertaining to Office Depot's Thompson Reuters tax information system.  Among other things, CW 2 has information regarding the process for filing taxes at Office Depot.  CW 2 also has knowledge of a town hall meeting held by Office Depot, during which the tax benefits the Company claimed for 2010 were

discussed and Odland and Newman made a presentation that included specific details about the Company's 2010 tax benefits.

48.     According to CW 2, Office Depot held town hall meetings mid-calendar year 2010 for director-level and above employees, with some meetings attended by all Office Depot employees.  During the meetings, "various scenarios" were presented, including detailed financial presentations that demonstrated the current cash position and financial plan for Office Depot for the year.  CW 2 attended a financial presentation that included information about the 2010 tax benefits that Office Depot would claim at the end of the year and the projected impact on "net losses" for the year.  According to CW 2, Odland and Newman, delivered the presentation.

49.     Confidential Witness #3 ("CW 3") was employed with Office Depot from 2008 to May 2011 as a Fixed Asset Accountant.  CW 3 was responsible for fixed asset tax accounting, as well as working on the implementation of a tax accounting method change for repair and maintenance expenses.  CW 3 has information regarding Deloitte Tax's presentation regarding tax accounting and the possibility of "increase [in] cash flow," as well as the IRS's denial of the Company's 2010 tax benefits.

50.     According to CW 3, Deloitte Tax held a presentation in May 2010 on the third floor of Office Depot's headquarters in room 310, during which four or five representatives delivered a presentation on a projector about tax accounting and the possibility of "increase[d] cash flow."  Vice President of Tax Siva Sellathurai ("Sellathurai"), General Accounting Manager Laura Boscia, and the Company's Director of Income Tax Accounting were in attendance.  In addition to the large presentation, there were four or five smaller meetings with one or two Deloitte Tax representatives.  The 2010 tax benefits and related "plan" were reviewed by the Director of Income Tax Accounting and Sellathurai

Case No. 9:11-cv-80364-RYSKAMP

and presented to "upper [Office Depot] management," including Controller Mark Hutchens and, as CW 3 believed, Newman for approval.

51.     The "plan" Deloitte Tax presented to Office Depot included an accounting method change for repair and maintenance expenses on fixed assets, which ultimately increased near term cash flow by $28 million.  According to CW 3, there was one problem with the implementation of the accounting method change for repair and maintenance expenses.  In 2009, Office Depot implemented Oracle.  The Oracle system did not allow the Company to electronically capture and categorize fixed assets and related expenses on projects.  The process of capturing and categorizing the fixed assets and costs had to be done manually by reviewing project data in the "Skyline" information system, which did not interface with the Oracle system.  Given the margin for human error associated with the manual process, CW 3 stated that errors were made in capturing and categorizing the costs.  The manual process represented an internal control deficiency.  According to CW 3, Office Depot planned to remediate the deficiency, but that plan had not yet been implemented by May 2011.

52.     CW 3 confirmed that the IRS disallowed the 2010 tax benefits that Office Depot claimed because of the difference between the retail calendar year and the tax calendar year.  For 2010, CW 3 stated that tax calendar year ended on December 31, 2010, whereas the retail calendar year ended on December 26, 2010.  The retail calendar differed from the tax calendar because the retail calendar was based on the number of weeks in each month.  Office Depot was aware of the difference in the calendar years when the Company filed the 2010 tax return and claimed the tax benefits.  Office Depot failed to adhere to the tax guidelines that would have allowed for the tax

- 16 -

Case No. 9:11-cv-80364-RYSKAMP

benefits if the tax calendar year ended two weeks prior to the actual end date – the issue which ultimately led to the restatement.

53.     CW 3 learned about the issue that ultimately resulted in the restatement via an internal email that was circulated by the Office Depot Communication department, as well as at a town hall meeting.  Austrian made an announcement during the town hall meeting, which took place in the auditorium on the first floor of the Company's headquarters in early calendar 2011.

### DEFENDANTS' FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

### A.     The July 27, 2010 Financial Report and Press Release

54.     The Class Period begins on July 27, 2010.  On that date, Office Depot issued its Financial Report for the second quarter ended June 26, 2010 (the "July 27, 2010 Financial Report") along with an accompanying press release.  Office Depot reported total Company sales of $2.7 billion, a 4% decrease compared to the second quarter of 2009.  The press release stated, in part:

> **The Company reported a loss, after preferred stock dividends, of $19 million in the second quarter of 2010, compared to a loss of $82 million in the second quarter of 2009. The loss per share was $0.07 for the quarter, versus a loss per share of $0.31 in the same period one year ago. Second quarter 2010 results included significant tax benefits** and second quarter 2009 results include Charges related to restructuring activities which negatively impacted earnings by $0.09 per share.

> \*     \*     \*

> **In the second quarter of 2010, the Company's free cash flow was a use of $62 million and closed the period with $578 million in cash on hand.**

> \*     \*     \*

> "Our second quarter operating results exceeded our expectations due to strong execution in North American Retail, North American Direct and the International Division," said Mike Newman, Office Depot's chief financial officer. "We're pleased that these results include year-over-year gross profit margin improvement, marking the fourth consecutive quarter of such improvement."

- 17 -

Case No. 9:11-cv-80364-RYSKAMP

55.     The July 27, 2010 Financial Report contained required SOX Certifications signed by Odland and Newman stating that the Form 10-Q did not include any material misrepresentations. The July 27, 2010 Financial Report further discussed the Company's accounting policies, and stated:

> *Basis of Presentation:* Office Depot, Inc., including consolidated subsidiaries, is a global supplier of office products and services. Fiscal years are based on a 52- or 53-week period ending on the last Saturday in December. The Condensed Consolidated Balance Sheet at December 26, 2009 has been derived from audited financial statements at that date. The condensed consolidated interim financial statements as of June 26, 2010 and June 27, 2009, and for the 13-week and 26-week periods ended June 26, 2010 (also referred to as "the second quarter of 2010" and "the first half of 2010") and June 27, 2009 (also referred to as "the second quarter of 2009" and "the first half of 2009") are unaudited. However, **in our opinion, these financial statements reflect adjustments (consisting only of normal, recurring items) necessary to provide a fair presentation of our financial position, results of operations and cash flows for the periods presented.** We have included the balance sheet from June 27, 2009 to assist in analyzing our company. The June 27, 2009 balance sheet includes a line for Deferred income taxes, separate from Other assets, to conform to the June 26, 2010 and December 26, 2009 presentation.

> *      *      *

> CRITICAL ACCOUNTING POLICIES

> **Our condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America.** Preparation of these statements requires management to make judgments and estimates. Some accounting policies have a significant impact on amounts reported in these financial statements. A summary of significant accounting policies and a description of accounting policies that are considered critical may be found in our 2009 Form 10-K, filed on February 23, 2010, in Note A of the Notes to the Consolidated Financial Statements and the Critical Accounting Policies section of the Management's Discussion and Analysis of Financial Condition and Results of Operations.

56.     The statements highlighted above were materially false and misleading.  Defendants never disclosed during the entire Class Period that the Company's election to carry back losses from 2010 to prior periods was impermissible.  The so-called "significant tax benefits" were illusory and were destined to be rejected by the IRS, thus negatively impacting Office Depot's reported 2010

Case No. 9:11-cv-80364-RYSKAMP

financial statements.  Indeed, Office Depot's July 27, 2010 Financial Report materially overstated and misrepresented the Company's financial performance, and both the second quarter loss and loss per share were falsely reported and should have been materially increased.  Specifically, the Company's improperly recognized $6 million in tax benefits, Office Depot's diluted losses per share should have increased by $0.02 for the second quarter 2010, and approximately $9 million of tax-related assets should have been removed from Office Depot's balance sheet.  It was also false for Defendants to represent that the Company's financial statements were prepared in accordance with GAAP and accurately represented the Company's true financial condition.

**B.      The July 27, 2010 Conference Call**

57.      Following issuance of the July 27, 2010 Financial Report and accompanying press release, Office Depot hosted a conference call to discuss its second quarter 2010 financial results and operations.  Odland and Newman participated in the call on behalf of the Company.  During the call, numerous false and misleading statements were made that were designed to artificially inflate the Company's stock price.  For example, Odland commented on the Company's second quarter recognized tax benefits, stating in part:

> **During the second quarter of 2010, we recognized tax benefits of $29 million, which resulted in a tax benefit rate of 75% on the second-quarter loss.** This benefit includes discrete items of approximately $13 million from the release of a valuation allowance in Europe because of improved performance in that jurisdiction and settlements with certain taxing authorities.
>
> Additionally, based on our latest estimate of the full-year effective tax rate, the current interim period includes a catch-up effect of prior-quarter results. As we mentioned on past calls, changes to temporary differences, combined with the need to recognize valuation allowances on our deferred tax assets in the US, will create volatility in our quarterly effective tax rates.

Case No. 9:11-cv-80364-RYSKAMP

Due to our Company's mix of earnings and fluctuations in these temporary differences, we now expect our annual effective tax rate to be a benefit of approximately 10%, and our cash tax rate to be a slight benefit for 2010.

*       *       *

**We now expect 2010 free cash flow to be in the $50 million to $70 million range**, lower than our previous guidance, due mainly to unfavorable currency movements and **our decision to delay the election to carry back tax losses from 2009 to the 2010 tax year. The decision to delay the tax loss carry-back election will maximize the cash flow benefit to the Company in the first quarter of 2011.**

58.     The representations highlighted above were materially false and misleading. Defendants knew at the time these statements were made that the Company lacked a reasonable basis, pursuant to the plain language of the WHBAA legislation, for claiming eligibility for 2010 carry back tax benefits.  As a result, Odland's statements regarding both expected tax benefits and 2011 free cash flow lacked a reasonable basis when made.   Defendants knew or recklessly disregarded that the recognized tax benefits for the quarter would be clawed back and negatively impact Office Depot's diluted earnings per share and 2011 free cash flow.

59.     In response to Defendants' false and misleading statements, the price of Office Depot common stock fell $0.33 per share, or 6.98%, from a closing price of $4.73 on July 26, 2010, to close at $4.40 per share on July 27, 2010.  But for Defendants' false and misleading statements, the price of Office Depot common stock would have fallen further.

60.     On October 25, 2010, Office Depot announced that, effective November 1, 2010, Odland would be resigning.  The Company also announced the appointment of Austrian as Interim Chairman and CEO.

Case No. 9:11-cv-80364-RYSKAMP

**C.      The October 27, 2010 Financial Report and Press Release**

61.      On October 27, 2010, Office Depot issued Financial Report for the third quarter ending September 25, 2010 (the "October 27, 2010 Financial Report") along with an accompanying press release.  Office Deport reported total Company sales of $2.9 billion, a 4% decrease compared to the third quarter of 2009.  The press release further stated in part:

> **The Company reported earnings, after preferred stock dividends, of $54 million in the third quarter, compared to a loss of $413 million in the third quarter of 2009. Earnings per share were $0.18 in the quarter, compared to a loss per share of $1.51 in the third quarter of 2009. Earnings in the third quarter of 2010 included significant tax** and interest expense **benefits** related to the settlement of certain tax positions relating to open years which positively impacted earnings in the quarter by $0.15 per share.  Third quarter 2009 results included charges for deferred tax asset valuation allowances, the reversal of tax benefits and Charges related to restructuring activities which negatively impacted earnings by $1.43 per share.

> *       *       *

> **The Company's free cash flow was $109 million in the third quarter of 2010 and cash on hand was $679 million at the end of the quarter.**

> *       *       *

> "We are pleased with our strong cash flow performance in the third quarter **which was driven by** both **earnings** and good working capital management," said Mike Newman, Office Depot's chief financial officer. "We have been executing very well across the entire enterprise as we focus on returning to sales growth and **delivering improved profit** as we go forward."

62.      The October 27, 2010 Financial Report contained required SOX Certifications signed by Odland and Newman stating that the Form 10-Q did not include any material misrepresentations. The October 27, 2010 Financial Report discussed the Company's accounting policies, and stated:

> *Basis of Presentation:* Office Depot, Inc., including consolidated subsidiaries, ("Office Depot") is a global supplier of office products and services. Fiscal years are based on a 52- or 53-week period ending on the last Saturday in December. The Condensed Consolidated Balance Sheet at December 26, 2009 has been derived from audited financial statements at that date. The condensed consolidated interim financial statements as of September 25, 2010 and September 26, 2009, and for the

Case No. 9:11-cv-80364-RYSKAMP

13-week and 39-week periods ended September 25, 2010 (also referred to as "the third quarter of 2010" and "the year-to-date 2010") and September 26, 2009 (also referred to as "the third quarter of 2009" and "the year-to-date 2009") are unaudited. **However, in our opinion, these financial statements reflect adjustments (consisting only of normal, recurring items) necessary to provide a fair presentation of our financial position, results of operations and cash flows for the periods presented.** We have included the balance sheet from September 26, 2009 to assist in analyzing our company. The September 26, 2009 balance sheet includes a line for Deferred income taxes, separate from Other assets, to conform to the September 25, 2010 and December 26, 2009 presentation. Additionally, the Deferred income taxes and Changes in working capital and other line items have been combined in the condensed consolidated statement of cash flows for the 39-week period ended September 26, 2009 to conform to the year-to-date 2010 presentation.

\*        \*        \*

CRITICAL ACCOUNTING POLICIES

**Our condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America.** Preparation of these statements requires management to make judgments and estimates. Some accounting policies have a significant impact on amounts reported in these financial statements. A summary of significant accounting policies and a description of accounting policies that are considered critical may be found in our 2009 Form 10-K, filed on February 23, 2010, in Note A of the Notes to the Consolidated Financial Statements and the Critical Accounting Policies section of the Management's Discussion and Analysis of Financial Condition and Results of Operations.

63.     The highlighted representations were materially false and misleading.  Defendants never disclosed during the entire Class Period that the Company's election to carry back losses from 2010 to prior periods lacked a reasonable basis and would be denied by the IRS, thus negatively impacting Office Depot's 2010 financial statements.  To that end, the Company's September 25, 2010 Financial Report overstated Office Depot's tax benefit for the third quarter and year-to-date periods, and overstated net earnings and income available to common shareholders by $22 million and $29 million, respectively.  Diluted earnings per share was overstated by $0.06 for the third

Case No. 9:11-cv-80364-RYSKAMP

quarter and $0.10 for the year-to-date period.  The Company also should have removed approximately $32 million of tax-related assets from its balance sheet.

**D.** **The October 27, 2010 Conference Call**

64.    Following issuance of the October 27, 2010 Financial Report and press release, Office Depot hosted a conference call to discuss its third quarter financial results and operations. Austrian and Newman participated in the call on behalf of the Company.  During the call, numerous false and misleading statements were made that were designed to artificially inflate the Company's stock price.  For example, during the call, Newman discussed the purported tax benefit, stating:

> **As mentioned at the outset of the call, we recognized significant tax** and interest **benefits during the quarter**, and I will try to provide some additional color now.

> The third quarter was impacted by the settlement of uncertain tax positions relating to open years, as well as a catch-up benefit from the change in the estimated annual effective tax rate for 2010. These items favorably impacted third-quarter taxes by $40 million.

> The settlement also resulted in lower interest costs related to these positions totaling $13 million. Combined, **the tax benefit of $40 million** [and] interest expense benefit of $13 million **positively impacted earnings per share by $0.15 in the third quarter.**

> In addition, during the quarter, we adopted a tax accounting method change for repair and maintenance expenses which allows a faster recovery of these costs and increases near-term cash flows. This impact, combined with the tax benefit on pretax earnings, totaled $7 million, which are viewed to be operational in nature.

> **So in total, we recognized tax benefits of $47 million in the third quarter, reflecting an effective tax benefit rate of 295%.**

> Our fourth-quarter effective tax rate will be impacted by bonus depreciation rules enacted by US tax authorities after the end of our fiscal third quarter, and the accounting method change for repair and maintenance expense. These changes are expected to drive our annual effective tax rate to be a benefit of approximately 92% and our cash tax to be a benefit of about $56 million for 2010, with about $40 million having been realized September year to date.

- 23 -

65.    The representations highlighted above were materially false and misleading. Defendants knew at the time these statements were made that the "significant" tax benefits depended upon the use of improper carry back claims.   At the time Newman made these statements, Defendants knew or recklessly disregarded that Office Depot's reported financial results – including its earnings and tax related assets – were overstated and would have to be restated, which would negatively impact Office Depot's diluted earnings per share and 2011 free cash flow.

66.    In response to the Company's preannounced third quarter results, the price of Office Depot common stock rose by $0.16 per share, or 3.5%, from a closing price of $4.63 on October 22, 2010, to a closing price of $4.79 per share on October 25, 2010, on heavy trading volume.

67.    On January 3, 2011, Janney Capital Markets upgraded Office Depot to "Buy" from "Neutral," citing four key points to its upgrade: (1) the appointment of a new CEO; (2) improving job market; (3) company specific revenue and margin drivers; and (4) **the Company's improving balance sheet**.  Janney Capital Markets also raised Office Depot's fair value to $10.00 from $6.00. Unbeknownst to the market, Office Depot's "improving" balance sheet was, in reality, bolstered by improperly claimed tax benefits.

### E.    February 22, 2011 Annual Report and Press Release

68.    On February 22, 2011, Office Depot issued its Annual Report to Stockholders for the fiscal year ended December 25, 2010 (the "2010 Annual Report"), along with an accompanying press release.  Office Deport reported total Company sales of $3.0 billion, a 3% decrease compared to the fourth quarter of 2009, and for full-year 2010, Office Depot reported sales of $11.6 billion, or a decrease of 4% compared to full-year 2009.  The press release further stated, in part:

Case No. 9:11-cv-80364-RYSKAMP

**The Company reported a net loss, after preferred stock dividends, of $58 million or $0.21 per share in the fourth quarter of 2010, compared to a loss of $77 million or $0.28 per share in the fourth quarter of 2009.**

- Fourth quarter 2010 results included charges related to actions to: 1) improve future operating performance; 2) change the ownership structure of certain international investments and 3) eliminate non-productive corporate assets and certain costs related to executive severance and retention.

- **Excluding these charges which total $87 million, net earnings, after preferred stock dividends, were $24 million or $0.09 per share in the fourth quarter of 2010.**

- **Significant tax benefits, from carrying back 2010 tax losses to an earlier tax period, positively impacted earnings in the fourth quarter of 2010.**

\* \* \*

"Our fourth quarter operating results were stronger than we anticipated, excluding the charges," said Neil Austrian, Office Depot's Interim Chairman and Chief Executive Officer. "We are taking the necessary steps to improve the future operating performance of this Company."

\* \* \*

FULL YEAR RESULTS

Full year 2010 sales were $11.6 billion, a decrease of 4% from the prior year. **The reported net loss, after preferred stock dividends, for the full year 2010 was $2 million, compared to a loss of $627 million in 2009. The reported loss per share on a diluted basis was $0.01 in 2010, compared to a loss per share of $2.30 in 2009.**

**Adjusted for charges and certain tax benefits, net earnings, after preferred stock dividends, were $30 million or $0.11 per diluted share for full year 2010, compared to a loss of $71 million or $0.26 per diluted share in 2009. The Company recognized additional tax benefits from carrying back 2010 tax losses to an earlier tax period, which positively impacted full year 2010 earnings.**

69.    The 2010 Annual Report contained required SOX Certifications signed by Austrian

and Newman stating that the 10-K did not include any material misrepresentations.  The 2010

Annual Report further stated, in part:

- 25 -

Case No. 9:11-cv-80364-RYSKAMP

The company experienced significant volatility in its effective tax rate throughout 2010 and 2009, in large part because of valuation allowances recorded during 2009 that limit the impact of deferred tax accounting. The 159% effective tax rate for 2010 includes approximately $30 million from favorable tax settlements, $10 million from the release of a European valuation allowance, $9 million tax benefits on the disposition of operating entities in Israel and Japan, as well as a tax accounting method change for repairs and maintenance expenses and the impact of bonus depreciation rules enacted during the fourth quarter of 2010. **In addition to the tax settlement and other discrete items, the company recognized significant tax benefits from deductions that will be carried back to an earlier tax period. Because the company has valuation allowances in that jurisdiction, these carryback items impact the 2010 effective tax rate, and are unusual, but will be received as a tax refund.** Carryback opportunities will not exist in this jurisdiction for future periods and the company will not be able to recognize originating deferred tax assets until the related valuation allowances are removed. This accounting will likely adversely impact future effective tax rates.

*     *     *

CRITICAL ACCOUNTING POLICIES

**Our consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America.** Preparation of these statements requires management to make judgments and estimates. Some accounting policies have a significant impact on amounts reported in these financial statements. A summary of significant accounting policies can be found in Note A of the Notes to Consolidated Financial Statements. We have also identified certain accounting policies that we consider critical to understanding our business and our results of operations and we have provided below additional information on those policies.

70.    The highlighted representations above were materially false and misleading.

Defendants never disclosed during the entire Class Period that the Company's election to carry back

losses from 2010 to prior periods was in question and could not be approved by the IRS, thus

negatively impacting Office Depot's 2010 financial statements.  The financial results reported in

Office Depot's December 25, 2010 Financial Report were materially overstated and false.

Specifically, the Company should have reduced its recorded full-year tax benefits by approximately

Case No. 9:11-cv-80364-RYSKAMP

$79.5 million, which would have resulted in a change from reported net earnings of $33.3 million to a net loss of $46.2 million.

**F.      The February 22, 2011 Conference Call**

71.      Following issuance of the 2010 Annual Report and press release, Office Depot hosted a conference call to discuss its fourth quarter and full-year 2010 financial results and operations. Austrian and Newman participated in the call on behalf of the Company.  During the call, numerous false and misleading statements were made that were designed to artificially inflate the Company's stock price.  For example, Austrian discussed the Company's significant tax benefits from carrying back 2010 tax losses, and stated in part:

> The reported results for the fourth quarter of 2010 included actions to improve future operating performance, change the ownership structure of certain international investments, and eliminate nonproductive corporate assets. Excluding these actions and certain costs related to executive severance and retention, **fourth-quarter 2010 net earnings after preferred stock dividends were $24 million or $0.09 a share. These results were favorable to the outlook we provided in October due to stronger than anticipated operating results and significant tax benefits from carrying back 2010 tax losses to an earlier tax period that positively impacted earnings in the fourth quarter.**
>
> *      *      *
>
> **Adjusted for charges and certain tax benefits, net earnings after preferred stock dividends for the full year 2010 were $30 million and the diluted earnings per share were $0.11 per share. We recognized additional tax benefits from carrying back 2010 tax losses to an earlier tax period, which positively impacted earnings for the full year 2010. Adjusted for charges and the impact of tax adjustments, the net loss for the full year 2009 was $71 million and the diluted loss per share was $0.26.**

72.      As the call went on, Newman further discussed the Company's financial results, and stated in part:

> **Turning to our results, the fourth quarter and full year 2010 tax rates on a reported basis were a benefit of 37% and 159% respectively. The tax benefits**

**were primarily driven by tax settlements and the Company's ability to carry back the 2010 tax loss to an earlier period. Because the Company continues to carry a full valuation against deferred tax assets in the US, the carry back of the 2010 tax loss and the resulting cash tax refunds are taken to operations and therefore impacted 2010 effective tax rate.**

**With the completion of the 2010 tax year, the Company has exhausted its ability to carry back tax losses at the US federal level.** This combined with the full valuation allowance against deferred tax assets in the US jurisdiction will likely adversely impact future effective tax rates.

73.     Discussing the amount of Office Depot's tax benefit and the Company's anticipated

tax refund in fiscal year 2011, Newman stated:

**Yes, we have received considerable tax refunds this year that relate to prior periods. To reiterate, if you look at our fourth quarter and total year reported tax rate, we are 37% and 157% respectively.** For the current period, the cash tax impact of those rates is relatively small, but **we have received refunds from prior periods that are significant and actually in 2010, in excess of $50 million.**

**So we have had benefits this year that relate to prior periods.** They are operational in nature. But those benefits that we have received do not relate to the current tax provisions in either Q4 or total year 2010. Does that help?

                              *          *          *

We would expect to see -- and we are not going to call the amount out, but we would expect to see additional cash tax refunds in 2011, yes. And that is factored into the guidance I gave earlier on free cash flow.

74.     The representations highlighted above were materially false and misleading.

Defendants knew or recklessly disregarded at the time these statements were made that the Company

lacked a reasonable basis for claiming tax carry back benefits pursuant to the WHBAA legislation.

The Company had no ability to carry back the 2010 tax loss to earlier periods.  Indeed, the Company

had long since exhausted an ability to "carry back tax losses at the US federal level."  As a result of

the foregoing, the Company's reported financial results discussed during the call were materially

false and overstated.  Indeed, the tax benefits recognized for the fourth quarter and full year 2010

were improper and would be clawed back, which would negatively impact, among other things, Office Depot's diluted earnings per share and 2011 free tax flow.

75.     Defendants' false statements directly misled the market.  For example, on February 22, 2011, Oppenheimer issued an analyst report entitled: "Quick Read: Signs of Process?"  The reported stated that Office Depot's "EPS Tops Expectations Primarily on Tax Benefits," increasing to $0.09 from a loss of $0.06 in the prior year.  Janney Capital Markets in a report entitled "It's Getting Better – Waiting On The Macro" agreed that "[t]he quarter was significantly helped by a tax benefit."

### G.    The March 31, 2011 Press Release – The Truth is Revealed

76.     On March 31, 2011, after the close of trading, Defendants issued a press release announcing that Office Depot would be restating its financial results.  The restatement applied to 2010 reported financial results and stemmed from rejection of the Company's improper attempt to carry back certain tax losses.  The press release further stated, in part:

> [T]he Internal Revenue Service has denied the Company's claim to carry back certain tax losses to prior tax years under economic stimulus-based tax legislation enacted in 2009, which claim was made after the Company consulted with its tax advisors. As a result, the Company has reassessed the carry back of tax losses in 2010 to prior periods and will restate its financial results to revise the accounting treatment regarding its original tax position. The periods covered by the restatement are the fiscal year ended December 25, 2010 and the quarters ended June 26, 2010 and September 25, 2010. The Company anticipates that it will file the restated financial statements on or about April 6, 2011.

> The expected impact of correcting the 2010 financial statements is to reduce full-year tax benefits by approximately $80 million, change net earnings for 2010 from $33 million to a net loss of $46 million and increase the net loss attributable to common shareholders from $2 million or $0.01 per share to $82 million or $0.30 per share. Additionally, the $63 million current tax receivable associated with the carry back amount will be removed from the balance sheet at December 25, 2010 and will adversely impact anticipated 2011 operating cash flow.

Case No. 9:11-cv-80364-RYSKAMP

## H.  April 1, 2011 Conference Call

77.  Following issuance on the press release, on April 1, 2011, Office Depot hosted a conference to discuss the restatement.  Newman participated in the call on behalf of the Company.  During the call, Newman admitted that Defendants had been "working on this and speaking with [the Company's] advisors" on the viability of "one-time election to carry back net operating losses five years under the American Recovery and Reinvestment Act of 2009 **since the second quarter of 2010**."  According to Newman, the entire "mistake" was the result of Office Depot's status as a 52-53 week filer, which Newman stated "pushed us out of this window where we could claw back our 2010 tax losses."  Despite knowing enough to restate the Company's earnings, Newman could not confirm or deny that the Company would hold the tax preparer involved liable.  Newman also stated that the restatement put Office Depot in violation of agreements with its lenders and caused the Company to seek a waiver on its debt covenants.  Newman further attempted to explain the Company's tax-related restatement, stating in part:

> Regarding the restatement, Office Depot originally prepared its 2010 financial statements under the belief and advice of our third-party tax advisor that it qualified for a one-time election to carry back net operating losses five years under the American Recovery and Reinvestment Tax Act of 2009. That legislation applied to tax years beginning before January 1, 2010.

> Because the Company is on a retail calendar, its 2010 fiscal year began on December 27, 2009, and this carry back provision was considered available to us. However in March 2011, the IRS denied the carry back claim citing other provisions in the tax code that superseded this legislation and put the filing outside of the allowable carry back time horizon. As a result of the denial of this claim, the Company will restate its financial results for the fiscal year ended December 25, 2010 included in its annual report on Form 10-K and its interim financial results filed on Form 10-Q for the quarters ended June 26, 2010 and September 25, 2010 to revise the accounting treatment regarding the carry back of tax provisions in 2010 to prior years.

> The Company anticipates that the amended financial statements will be filed on or about April 6, 2011. The expected impact of correcting the 2010 financial statements

is to reduce full-year tax benefits of approximately $80 million; to change net earnings for 2010 from $33 million to a net loss of $46 million; and to increase the net loss attributable to common shareholders from $2 million or $0.01 per share to a net loss of $82 million or $0.30 per share.

The expected impact to 2010 quarterly periods is a reduction in diluted earnings per share as compared to amounts previously reported in Qs 2 through 4. The bulk of these adjustments will be in Q4.

The restatements have no impact on our previously reported 2010 EBIT or EBITDA and no net impact on 2010 cash flows. The Form 8-K was filed with the US Securities and Exchange Commission at 6 a.m. this morning and now I would like to talk about our first-quarter 2010 outlook both as it relates to EBIT and cash flow.

*     *     *

Had expected Q1 to be softer than prior year as a result of sales volume, reinvestments we are making back into key business initiatives, restructuring benefits, as well as paper cost increases in ink and toner pricing in Europe. Q1's free cash flow is estimated to be a use of over $100 million, excluding the $60 million IRS cash refund shortfall, the Q1 free cash flow use was in line with our expectations and was principally driven by higher inventories, the timing of accounts payable, the normal payment of year-end accruals, and compensation-related items and restructuring activities.

*     *     *

For 2011 free cash flow, our previous guidance was $50 million for the year which had assumed a $60 million cash refund from the IRS. We do still expect 2011 free cash flow to be positive as we plan to offset some of the shortfall resulting from the IRS denial of the tax claim with other actions.

78.     During the question and answer portion of the call, Newman commented on whether there were any material weaknesses in the Company's controls or procedures, as well as the implications of any discovered material weaknesses.  Newman also discussed the potential liability for bad advice from the Company's external tax counsel, stating:

Yes, we probably need a few more days before we would even be prepared to talk about that. You know, the gist of this is that when you have something like this of this magnitude, the first reaction, it is a material weakness. But at the same point in time when you look at the fact set, we are spending time really understanding how it came about and we're working through this internally.

Case No. 9:11-cv-80364-RYSKAMP

This is just a tax issue. I don't want to belittle it. We take this very seriously. It hasn't impacted our EBIT, our EBITDA, or our cash flow, which is the metrics that we focus on. I am sick about it. It's my responsibility. But we will -- I think from the standpoint of whether it's material or not will just be a disclosure that we will make and then we will have internal process adjustments we'll need to make to respond to it.

\*　　　\*　　　\*

You know, I don't want to go there, but I will say that we spent -- this restatement goes back to Q2 of 2010. So we have been working on this and speaking with our advisers on this since the second quarter of 2010. We got input from them. It was a mistake. It was a misread of statutes and how it applied to us being a 52, 53 week filer and as a result pushed us out of this window where we could claw back our 2010 tax losses.

So at this point in time, I am interested in making sure we get the information out, making sure we get the investors understanding what happened. We will address the material weaknesses and everything else going forward.

79.     In response to news of the restatement and the revelation of Office Depot's true financial condition, the price of Office Depot common stock dropped sharply, falling 9%, or $0.42 per share, from a closing price of $4.63 on March 31, 2011, to close at $4.21 per share on April 1, 2011, on heavy trading volume, as set forth in the chart below:



80.     On April 1, 2011, *Forbes* reported that Office Depot was pulling down its entire sector, stating its "[s]hares are trading down about 13.4% Friday" while "Rival Staples is trading down over .7%, while OfficeMax trades down over 3.6%." *MarketWatch* also reported that "Office Depot drags down retail index," reporting that while "[m]ost retailers' stocks rose Friday after the Labor Department said the U.S. unemployment rate dipped in March, … a sharp drop in Office Depot Inc.'s shares helped to pull down the sector's benchmark." *Benzinga* reported that Office Depot was "one of the worst performers on the New York Stock Exchange."

81.     The true facts, which were known by the Defendants, but concealed from the market during the Class Period, were as follows:

(a)     The $80 million in carry back tax "benefits" Office Depot recognized during the Class Period for the second, third, and fourth quarter of 2010 were not permitted;

(b)     The $63 million in current tax receivables associated with the carry back amount should not have been reported on the Company's balance sheet at December 25, 2010;

- 33 -

Case No. 9:11-cv-80364-RYSKAMP

(c)     Office Depot's financial results were not reported in compliance with GAAP during the Class Period;

(d)     Office Depot's financial statements overstated the Company's assets and profits in violation of GAAP throughout the Class Period;

(e)     The Company's internal controls were inadequate to prevent it from improperly inflating the value of its earnings and assets throughout the Class Period; and

(f)     Defendants overstated Office Depot's business and financial metrics during the Class Period.

82.     As a result of Defendants' false and misleading statements, Office Depot's stock traded at artificially inflated levels during the Class Period.  When the restatement came to light and Office Depot's true financial condition was revealed, Office Depot's stock price fell by nearly 31% from its Class Period high of $6.10 on January 5, 2011, to close at $4.21 per share on April 1, 2011. This drop removed the inflation of Office Depot's stock price, causing real economic loss to investors who had purchased the stock at artificially inflated prices during the Class Period.

## ADDITIONAL SCIENTER ALLEGATIONS

83.     The Individual Defendants were privy to confidential and proprietary information concerning Office Depot, its operations, finances, financial condition, and present and future business prospects.  The Individual Defendants also had access to material adverse non-public information concerning Office Depot, as discussed in detail below.  Because of their positions with Office Depot, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance

- 34 -

Case No. 9:11-cv-80364-RYSKAMP

at management and board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or were severely reckless in disregarding the fact that adverse facts specified herein had not been disclosed to, and were being concealed from (in order to mislead), the investing public.

84.     Throughout the Class Period, the Individual Defendants were able to, and did, control the contents of the Company's SEC filings, reports, press releases, and other public statements. The Individual Defendants were provided with copies of, reviewed and approved, and/or signed such filings, reports, releases, and other statements prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. The Individual Defendants were also able to, and did, directly or indirectly, control the conduct of Office Depot's business, the information contained in its filings with the SEC, and its public statements. Moreover, the Individual Defendants made or directed the making of affirmative statements to the investing public, and participated in meetings, conference calls, and discussions concerning such statements. Each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations that were being made were then false and misleading. As a result, each of the Individual Defendants is responsible for the accuracy of Office Depot's corporate releases detailed herein and is therefore responsible and liable for the misrepresentations and omissions contained therein.

85.     The Individual Defendants are liable as direct participants and co-conspirators with respect to the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the

Case No. 9:11-cv-80364-RYSKAMP

meaning of §20 of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Office Depot's business.

86.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to the investing public.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

87.     As senior executive officers and/or directors and controlling persons of a publicly traded company whose common stock and other securities were, and are, registered with the SEC pursuant to the Exchange Act, and whose shares traded on the New York Stock Exchange ("NYSE") and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to Office Depot's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Office Depot's common stock would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

Case No. 9:11-cv-80364-RYSKAMP

88.     The Individual Defendants are liable as primary participants in a fraudulent scheme and wrongful course of business which operated as a fraud or deceit on purchasers of Office Depot common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The fraudulent scheme employed by the Individual Defendants was a success, as it: (i) deceived the investing public regarding Office Depot's prospects and business; (ii) artificially inflated the price of Office Depot common stock; and (iii) caused Plaintiff and other members of the Class to purchase Office Depot common stock at inflated prices (which artificial inflation came out of the stock when the relevant truth regarding the true financial condition of Office Depot was revealed).

89.     As alleged herein, Defendants acted with scienter in that they knew or disregarded with severe recklessness that the public documents and statements, issued or disseminated in the name of the Company, were materially false and misleading, knew that such statements or documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail throughout this complaint, Defendants, by virtue of their receipt of information reflecting the true facts regarding Office Depot, their control over, and/or receipt and/or modification of Office Depot's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Office Depot, participated in the fraudulent scheme alleged herein.

90.     Defendants knew and/or disregarded with severe recklessness the falsity and misleading nature of the information that they caused to be disseminated to the investing public.  The

Case No. 9:11-cv-80364-RYSKAMP

ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including each of the Individual Defendants.

### APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

91.     At all relevant times, the market for Office Depot common stock was an efficient market for the following reasons, among other things:

(a)     Office Depot stock met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Office Depot filed periodic public reports with the SEC; and

(c)     Office Depot regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

92.     As a result, the market for Office Depot common stock promptly digested current information regarding Office Depot from all publicly-available sources and reflected such information in the price of Office Depot stock.  Under these circumstances, all purchasers of Office Depot common stock during the Class Period suffered similar injury through their purchase of Office Depot common stock at artificially inflated prices and a presumption of reliance applies.

### LOSS CAUSATION

93.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated Office Depot's stock price

throughout the Class Period.  These acts and omissions operated as a fraud or deceit on Class Period purchasers of Office Depot stock by misrepresenting the Company's business success and future business prospects, including, but not limited to, misrepresentations regarding Office Depot's specific financial condition, including its earnings, income tax rates, tax-related receivables, and free cash flow.

94.     As a result of Defendants' fraudulent conduct, the prices at which Office Depot stock traded were artificially inflated during the Class Period.  When Plaintiff and other members of the Class purchased their Office Depot securities, the true value of such securities was substantially lower than the prices actually paid by Plaintiff and the other members of the Class.

95.     By misrepresenting the success of the Company's business and concealing its improprieties, Defendants presented a misleading picture of Office Depot's financial condition and future business prospects.  These misleading financial results caused and maintained the artificial inflation in Office Depot's stock price throughout the Class Period until the truth was revealed to the market, as described herein.

96.     As a result of Defendants' materially false and misleading statements and documents, as well as the adverse, undisclosed information known to the Defendants, Plaintiff and other members of the Class relied, to their detriment, on such statements and documents, and/or the integrity of the market, in purchasing their Office Depot stock at artificially inflated prices during the Class Period.  Had Plaintiff and the other members of the Class known the truth, they would not have taken such actions.

97.     As explained herein, Defendants' materially false statements directly or proximately caused, or were a substantial contributing cause of, the damages and economic loss suffered by

Plaintiff and other members of the Class.  These statements served to maintain the artificial inflation in Office Depot's stock price throughout the Class Period and until the truth leaked into and was revealed to the market, at which time the prior inflation came out of the stock.

98.     Defendants' false and misleading statements had their intended effect and directly and proximately caused, or were a substantial contributing cause of, Office Depot's stock trading at artificially inflated levels, reaching as high as $6.10 per share on January 5, 2011.

99.     Nevertheless, the market's expectations were ultimately corrected on March 31, 2011, when Defendants revealed Office Depot's shocking restatement of its financial results.  This disclosure had a significant effect on the price of Office Depot common stock, as it fell by 9% to close at $4.21 per share, on April 1, 2011.  The cumulative impact of this decline was that the price of Office Depot stock fell 31% from its Class Period high, causing substantial harm to investors who suffered hundreds of millions of dollars in losses as the artificial inflation generated by Defendants' fraud was removed.

100.     The timing and magnitude of the decline in Office Depot common stock negate any inference that the losses suffered by Plaintiff and other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiff and other members of the Class was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Office Depot common stock and its subsequent decline in value as Defendants' prior misrepresentations and other ongoing fraudulent conduct were revealed, market expectations were corrected, and the artificial inflation came out of the price of Office Depot common stock.

Case No. 9:11-cv-80364-RYSKAMP

101.    In addition, the decline in price of Office Depot common stock was a natural and probable consequence of Defendants' fraud and should have been foreseen by Defendants in light of the attending circumstances.  The market reactions to the disclosure of Office Depot's true financial condition were foreseeable to Defendants and well within the "zone of risk" concealed by Defendants' fraudulent conduct.

**NO SAFE HARBOR**

102.    The federal statutory safe harbor provision, which provides for forward-looking statements under certain circumstances, does not apply to any of the allegedly false statements pleaded in this complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Office Depot who knew that those statements were false when made.  Moreover, to the extent that Defendants issued any disclosures designed to "warn" or "caution" investors of certain "risks," those disclosures were also false and misleading since they did not disclose that Defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of material adverse facts undermining such disclosures.

Case No. 9:11-cv-80364-RYSKAMP

**COUNT 1:  FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS**

103.    Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.  This claim is asserted against all Defendants.

104.    During the Class Period, Office Depot and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Office Depot common stock; and (iii) cause Plaintiff and other members of the Class to purchase Office Depot stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Office Depot and the Individual Defendants, and each of them, took actions set forth herein.

105.    These Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operate as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Office Depot common stock in violation of §10(b) of the Exchange Act and Rule 10b-5.  These Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.  The Individual Defendants are also sued as controlling persons of Office Depot, as alleged below.

106.    In addition to the duties of full disclosure imposed on Defendants as a result of their making affirmative statements and reports, or participating in the making of affirmative statements and reports, or participating in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to

- 42 -

investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. §210.01 *et seq.*) and S-K (17 C.F.R. §229.10 *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and operational performance, so that the market prices of the Company's common stock would be based on truthful, complete and accurate information.

107. Office Depot and each of the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, performance, and future prospects of Office Depot as specified herein.

108. These Defendants each employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Office Depot's value, performance, and financial condition, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state necessary facts in order to make the statements made about Office Depot and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in and a course of conduct which operated as a fraud and deceit upon the purchasers of Office Depot common stock during the Class Period.

109. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts:  a) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period; b) each of the Individual Defendants, by

virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial performance, projections and/or reports; and c) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public which each knew or disregarded with severe recklessness was materially false and misleading.

110.    Each of these Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with severely reckless disregard for the truth in that each failed to ascertain and to disclose such facts, even though such facts were available to each of them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or with severe recklessness and for the purpose and effect of concealing Office Depot's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' misstatements of the Company's financial condition and performance throughout the Class Period, each of the Individual Defendants, if he did not have actual knowledge of the misrepresentations and omissions alleged, was severely reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false and misleading.

111.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of Office Depot common stock were artificially inflated during the Class Period.  In ignorance of the fact that market prices of Office Depot common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or

Case No. 9:11-cv-80364-RYSKAMP

disregarded with severe recklessness by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Office Depot stock during the Class Period at artificially high prices and were damaged thereby, as evidenced by, among others, the stock price decline on or about April 1, 2011, when the artificial inflation was released from Office Depot stock.

112.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known of the true performance, future prospects and intrinsic value of Office Depot, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Office Depot common stock during the Class Period, or they would not have done so at the artificially inflated prices which they paid.

113.    By virtue of the foregoing, Office Depot and the Individual Defendants have each violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

114.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, as evidenced by, among others, the stock price decline on or about April 1, 2011, when the artificial inflation was released from Office Depot stock.

## COUNT II:  FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS

115.    Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.  This claim is asserted against the Individual Defendants.

Case No. 9:11-cv-80364-RYSKAMP

116.    Each of the Individual Defendants acted as a controlling person of Office Depot within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's fraudulent marketing and promotions and actual performance, each of the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

117.    In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same.

118.    As set forth above, Office Depot and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their controlling positions, each of the Individual Defendants is liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's stock during the Class Period, as evidenced by, among others, the stock price decline on or about April 1, 2011, when the artificial inflation was released from Office Depot stock.

Case No. 9:11-cv-80364-RYSKAMP

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

a.    Determining that this action is a proper class action and designating Lead Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure;

b.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Case No. 9:11-cv-80364-RYSKAMP

DATED:  September 6, 2011       ROBBINS GELLER RUDMAN
          & DOWD LLP


           *s/Robert J. Robbins*
          ROBERT J. ROBBINS

DAVID J. GEORGE
Florida Bar No. 0898570
dgeorge@rgrdlaw.com
ROBERT J. ROBBINS
Florida Bar No. 0572233
rrobbins@rgrdlaw.com
BAILIE L. HEIKKINEN
Florida Bar No. 0055998
bheikkinen@rgrdlaw.com
120 E. Palmetto Park Road, Suite 500
Boca Raton, FL  33432-4809
Telephone:  561/750-3000
561/750-3364 (fax)

***Lead Counsel for Plaintiff***

CAVANAGH & O'HARA
JOHN T. LONG
407 East Adams Street
Springfield, IL  62701
Telephone:  217/544-1771
217/544-9894 (fax)

***Additional Counsel for Plaintiff***

Case No. 9:11-cv-80364-RYSKAMP

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 6, 2011, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system.  The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this notice as service of this document by electronic means.

*s/ Robert J. Robbins*_____
ROBERT J. ROBBINS

- 49 -